## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JUSTIN OGIN,                   :        CIVIL NO: **3:CV-13-01365**
                               :
        Plaintiff,             :
                               :        (Judge Kosik)
            v.                 :
                               :        (Magistrate Judge Blewitt)
COMMISSIONER OF                :
SOCIAL SECURITY,               :
                               :
                               :
        Defendant.             :


## REPORT AND RECOMMENDATION

### I.    PROCEDURAL HISTORY.

In this case, we are called upon to decide whether the ALJ properly evaluated Plaintiff Justin Ogin's alleged impairment of intellectual disability under § 12.05C of the listing of impairments. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. Having found several inconsistencies in the ALJ's treatment of Plaintiff's alleged impairment of intellectual disability under the medical listings, we recommend that this case be remanded for further proceedings consistent with this report.

On June 30, 2010, Plaintiff protectively filed Title II and  Title XVI applications for a period of DIB, and SSI.  (TR 124-33, 149).[1]  In both applications Plaintiff alleged that he was unable to work as of October 1, 2007, in large part, to an intellectual disability.  (TR 124, 131).

---

[1]"TR" refers to the transcript from the Social Security Administration and appears as Document 8 and its attachments on the ECF docket report. The pinpoint citations to the transcript refer to the Bates-stamped number in the bottom right-hand corner of each page in Document 8.

Plaintiff's DIB and SSI applications were initially denied by the Agency on January 6, 2011.  (TR 101-08).  Thereafter, Plaintiff filed a written request for a hearing.  (TR 109-10).  On November 8, 2011, a hearing was held before Administrative Law Judge ("ALJ") Sridhar Boini in Wilkes-Barre, Pennsylvania.  (TR 11-53).  Plaintiff, and his wife, Jennifer Ogin, both appeared and testified at the hearing.  (*Id.*).  An impartial vocational expert ("VE"), Patricia L. Chilleri, also appeared and testified.  (*Id.*).  On January 19, 2012, the ALJ issued a decision denying Plaintiff's applications for  benefits and found that Plaintiff was not under a disability within the meaning of the Act from October 1, 2007, the alleged disability onset date, through the date of the ALJ's decision. (TR 85-97).

The Plaintiff sought review of the ALJ's decision by the Appeals Council.  On March 18, 2013, the Appeals Council denied Plaintiff's request for review.  (TR 1-6).

On May 17, 2013, Plaintiff, through counsel, filed a Complaint appealing the final decision denying his applications for Social Security Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§401-433, 1381-1383f. (Doc. 1). This Court has jurisdiction over this case pursuant to 42 U.S.C. §405(g) and 42 U.S.C. § 1383(c)(3).

On August 22, 2013, the Commissioner filed an Answer together with a copy of the administrative record.  (Docs. 7, 8).  On October 4, 2013, Plaintiff filed his brief.  (Doc. 9).  After being granted an extension of time, the Commissioner filed her brief on December 6,

2013.  (Doc. 12).  On December 20, 2013, Plaintiff filed a reply.  (Doc. 13).  This appeal is now

ripe for disposition.[2]

## II.    STANDARD OF REVIEW.

Resolution of the instant social security appeal involves an informed  consideration of

the respective roles of two adjudicators–the ALJ and this court.   When reviewing the denial of

disability benefits, we must determine whether the denial is supported by substantial evidence.

*Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm. of Soc. Sec.*, 529 F.3d

198, 200 (3d Cir. 2008).  Substantial evidence "does not mean a large or considerable amount

of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181

F.3d 358, 360. (3d Cir. 1999); *Johnson*, 529 F.3d at 200.  It is less than a preponderance of the

evidence but more than a mere scintilla.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing

evidence or fails to resolve a conflict created by the evidence.   *Mason v. Shalala,* 994 F.2d

1058, 1064 (3d Cir. 1993).   In an adequately developed factual record, however, substantial

evidence may be "something less than the weight of the evidence, and the possibility of drawing

two inconsistent conclusions from the evidence does not prevent [the decision] from being

supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620

(1966). Furthermore, in determining if the ALJ's decision is supported by substantial evidence

---

[2]Under the Local Rules of Court, "[a] civil action brought to review a decision of the
Social Security Administration denying a claim for social security disability benefits" is
"adjudicated as an appeal."  L.R. 83.40.1.

the court may not parse the record but rather must scrutinize the record as a whole.  *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

## III.   DISABILITY EVALUATION PROCESS.

At the outset, it is the responsibility of the ALJ in the first instance to determine whether a Plaintiff has met the statutory prerequisites for entitlement to benefits. To receive disability benefits, Plaintiff must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).  In order to be eligible to receive DIB under Title II of the Act, a Plaintiff must also show that he or she contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R.  §404.131.  SSI under Title XVI of the Act, however, is a need-based program, and therefore  insured status is irrelevant in determining an individual's eligibility.

Furthermore:

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A); see also 42 U.S.C. § 1382c(a)(3)(B).

In determining whether an individual is "disabled" as defined by the Act, the ALJ must proceed through a five-step evaluation.  See 20 C.F.R. §§ 404.1520, 416.920; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The Commissioner must sequentially determine: (1) whether Plaintiff is engaged in substantial gainful activity; (2) whether Plaintiff has a severe impairment; (3) whether Plaintiff's impairment meets or equals a listed impairment; (4) whether Plaintiff's impairment prevents him from doing past relevant work; and (5) whether Plaintiff's impairment prevents him from doing any other work.  *Id.*

Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm. of SSA*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p.  In making this assessment, the ALJ considers all of Plaintiff's impairments, including any medically determinable non-severe impairments.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).

This disability determination involves shifting burdens of proof.  The initial burden rests with Plaintiff to demonstrate that she is unable to engage in past relevant work.  If Plaintiff satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic procedural and substantive requirements. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id*. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Com. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

Here, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008. (TR 87). Then, the ALJ proceeded through each step of the sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Act from October 1, 2007, his alleged disability onset date, through January 19, 2012, the date of the ALJ's decision. (TR 87-97).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity subsequent to his alleged onset date of October 1, 2007. (TR 87).

At step two, the ALJ found that Plaintiff's learning disability, anxiety (by history), and depression (by history) were severe. (TR 87). The ALJ also found that Plaintiff's alleged impairments of attention deficit disorder ("ADD"), attention deficit hyperactivity disorder ("ADHD"), back pain, and history of kidney stones were non-severe medically determinable

impairments.  (TR 88).

At step three, the ALJ found that, considering listings 12.04, 12.05, and 12.06, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, Appx. 1.  (TR 88). Specifically, with respect to listings 12.04, 12.06, and 12.05D, the ALJ found that Plaintiff's impairment did not meet listing severity because he was only mildly restricted in his activities of daily living, mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no reported episodes of decompensation for extended duration.[3]  (TR 89-90).  The ALJ concluded that Plaintiff did not meet the criteria for listing

---

[3]To meet listing 12.04 or 12.06 a Plaintiff must meet either the paragraph "A" and "B" criteria of the listing, or meet the paragraph "C" criteria.  To satisfy the "B" criteria of listings 12.04 and 12.06, a Plaintiff's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining concentration, persistence or pace; or, repeated episodes of decompensation each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 §12.00 *et seq.*

To satisfy the paragraph "C" criteria of listing 12.04 Plaintiff must have a medically documented history of a chronic affective disorder of at least two years of duration that has caused more than minimal limitation of ability to do basic work, with symptoms or signs currently attenuated by medication or psychological support, and one of the following: repeated episodes of decompensation, of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate; or, current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement.  20 C.F.R. Pt. 404, Subpt. P, Appx. 1 §12.04C. To meet the paragraph "C" criteria of listing 12.06 a Plaintiff's anxiety disorder must result in the complete inability to function independently outside of the area of home.  20 C.F.R. Pt. 404, Subpt. P, Appx. 1 §12.06C.

A "marked" limitation means more than moderate but less than extreme. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00C.

"Episodes of decompensation" are exacerbations or temporary increases in symptoms accompanied by a loss of adaptive functioning, and "repeated episodes of decompensation, each of extended duration," means three episodes within one year, or an average of one

12.05A, B, or C because he was not dependent on others for personal needs, did not have a valid IQ score under 70, and did not have another impairment imposing an additional work-related limitation of function.  (TR 91).

Before beginning step four, the ALJ found that Plaintiff had the requisite RFC to perform light work,[4] subject to the following additional limitations:

> The [Plaintiff] would not be able to bend to the floor and would not be able to engage in kneeling or crawling, except occasionally.  The [Plaintiff] is restricted to performing simple, routine tasks set forth in a stable work environment, not subject to any more than occasional changes.  The [Plaintiff] would not be able to perform any independent decision-making or work place judgments.  The [Plaintiff] would be precluded from team-type work activities and would be precluded from interacting on a customer-service basis with members of the public, although incidental contact would be acceptable.  The [Plaintiff] can perform work that is of a moderate production pace, not a high volume, high intensity, strictly managed quota system work pace.

(TR 91-92).

At step four, the ALJ found that, based on testimony by a VE, Plaintiff had no past

---

episode every four months, with each episode lasting for at least two weeks. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 §12.00C.4.
To satisfy and the "D" criteria of 12.05, a Plaintiff must meet the "B" criteria described above, in addition to meeting the "diagnostic definition" contained within the introductory paragraph of listing 12.05.  *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 §12.00 *et seq.*

[4]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighting up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls.  To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities.  If someone can do light work, he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  *See* 20 C.F.R. §§ 404.1567, 416.967.

relevant work. (TR 20-21, 95).

At step five, the ALJ found that, considering Plaintiff's age, RFC, and vocational factors, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (TR 96). In making his decision, the ALJ relied on information provided by a VE. Specifically, the VE testified that an individual with the same age, vocational factors, and RFC as Plaintiff could perform the representative occupations of: sorter, DOT 788.687-106; packer, DOT 920.687-146; and assembler, DOT 733.685-010. (TR 46-47).

## IV. BACKGROUND.

Plaintiff, born May 4, 1985, was 26 years old on the date of his administrative hearing. (TR 19). He attended special education classes beginning in second grade, and continued to receive special education until he until he left school during eleventh grade. (TR 204). Plaintiff testified that he tried, unsuccessfully, to obtain his general equivalency diploma ("GED").[5] (TR 20). In the past he performed some work, but never held a job for more than a few months at a time. (TR 41, 162). The VE testified that Plaintiff's earnings never reached the level of substantial gainful activity. (TR 20-21).

At the time of the administrative hearing Plaintiff lived with his wife of five years, and two of his three children. (TR 27-28). Plaintiff's wife testified that Plaintiff required assistance to read, and could not attend medical appointments or go shopping without another adult. (TR

---

[5]Plaintiff asserted that he looked into obtaining his GED, but that his efforts were impeded by his inability to fill out the required paperwork. (TR 20). Plaintiff's wife completed most of the forms that were submitted in conjunction with Plaintiff's applications for benefits. *See e.g.* (TR 159-69, 170-80, 183-89, 190-96).

34-35).  Plaintiff had a driver's license but never drove without another adult in the car, (TR 35-36).  Plaintiff was unable to schedule or remember his medical appointments.  (TR 39).

Plaintiff was able to perform some housework.  (TR 38).  His wife testified that Plaintiff helped her with dishes, cleaning and vacuuming.  Plaintiff was also able to do some simple cooking, e.g., heat prepared meals, or fix grilled cheese sandwiches.  (TR 38).  Plaintiff was also responsible for making sure his nine year old child left for school on time each morning.  (TR 37).  Plaintiff did not meet with teachers, or help the nine-year-old with school work.  (TR 38).  Every day, after his nine-year old child left for school, Plaintiff and his four-year-old child were picked-up by Plaintiff's father, and transported to Plaintiff's parents' home.  (TR 31-33).  While his wife worked, Plaintiff's parents cared for the children.  (*Id.*).  Plaintiff has never watched his children, without another supervising adult, for more than two hours at a time.  (TR 33).

## V.    DISCUSSION.

Plaintiff argues that substantial evidence does not support the ALJ's decision denying his claims for DIB and SSI.  "[The District] Court's review is plenary with respect to all questions of law."  *Hansford v. Astrue*, 805 F.Supp.2d 140, 143 (W.D.Pa. 2011)(citation omitted).  "With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is 'supported by substantial evidence.'"  *Id.*(citations omitted).  "The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record."  *Id.*(citation omitted).  Rather, the Court must review the findings of fact and conclusions of the ALJ to determine whether they are supported by substantial evidence.  If the ALJ's findings of fact are supported by substantial evidence, they "shall be conclusive."

*Id.*(citations omitted).  Thus, the Court applies a "deferential standard of review."  *Id.*(citations omitted).

**A.      The ALJ's Finding that Plaintiff did not meet listing 12.05C is not supported by Substantial Evidence**

Plaintiff argues that the ALJ improperly found that Plaintiff's mental impairment was not of listed severity. (Doc. 9 pp.10-16).  Plaintiff correctly cites that in order to be found disabled under Listing 12.05C there must exist a valid IQ score between 60 and 70.  Plaintiff also accurately observes that the lowest IQ score yielded by a single test must be considered by an ALJ when concluding that a Plaintiff's IQ falls between 60 and 70.  In this case Plaintiff was administered IQ tests at ages 13, 18, and 25.  The lowest single score of the IQ test administered in 1998 when Plaintiff was 13 years old was 63.  The lowest single score of the IQ test administered in 2003 when Plaintiff was 18 years old was 71.  The lowest single score of the IQ test administered in 2010 when Plaintiff was 25 years old was 65.  Plaintiff argues that the ALJ erroneously invalidated Plaintiff's 2010 IQ score.  Plaintiff also asserts that the ALJ erroneously concluded that Plaintiff did not have another impairment imposing an additional and significant work-related limitation of function.  The Commissioner argues that the ALJ's decision was supported by substantial evidence, and thus should not be disturbed.  (Doc. 12 pp. 14-19).

In 1998, clinical psychologist Marianne Vitale, Ed.D. administered a Wechsler Intelligence Scale for Children-III ("WISC-III") intelligence test to Plaintiff was 13. (TR 203). The test yielded a verbal IQ score of 63, a performance IQ score of 75, and a full-scale IQ score of 67; Dr. Taren reported that Plaintiff was diagnosed with mild mental retardation based on his

1998 IQ scores.[6]  (*Id.*).  The ALJ did not address the validity of Dr. Vitale's IQ assessment.

In August 2003, Plaintiff underwent a psychological evaluation with intelligence testing administered by state agency psychological consultant Paul Taren, Ph.D. in conjunction with a prior application for benefits.  (TR 203-07).  Dr. Taren administered the Wechsler Adult Intelligence Scale-III ("WAIS-III") test which yielded a verbal  IQ score of 71, a performance IQ score of 94, and a full scale IQ score of 79.  (TR 205).  In his report Dr. Taren noted that because of the unusually large disparity between Plaintiff's verbal and performance IQ scores, the full scale IQ score of 79 was not an effective single index of his general intelligence.  (TR 206).  Dr. Taren also opined that the notable difference between the 2003 test and 1998 test scores was likely due to general test unreliability; but noted that it was "less likely, though possible" that Plaintiff's intelligence had improved with maturation.  (*Id.*).  Dr. Taren reported that his test results were otherwise consistent with Plaintiff's general functioning.  (*Id.*).  Dr. Taren diagnosed Plaintiff with borderline intellectual functioning.  (TR 206).

In October 2010, Plaintiff underwent another psychological evaluation with intelligence testing administered by state agency psychological consultant Stephen Timchack, Psy.D. in conjunction with this application for benefits.  (TR 320-27).  Dr. Timchack administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") test, which yielded a full scale IQ score of 65; Plaintiff's scores ranged from "extremely low" to "borderline" in all areas.  (TR 323).  Dr. Timchack reported that the 2010 IQ test results were a valid and reliable representation of Plaintiff's level of intellectual functioning, but did not provide any explanation for the variance

---

[6]Plaintiff's 1998 IQ test is discussed by Dr. Taren in his psychological evaluation.  No report from Dr. Vitale was included in the administrative record.

between his 2010 IQ scores, and the prior scores from 2003.  (TR 323).  Dr. Timchack

diagnosed Plaintiff with depressive disorder, anxiety disorder, and "rule out mental retardation."

(TR 326).  The ALJ found that Plaintiff's IQ score of 65 was invalid.

At step three of the sequential evaluation process, the ALJ must determine whether a

Plaintiff's alleged impairment is equivalent to a number of listed impairments that are

acknowledged to be so severe as to preclude substantial gainful activity.   20 C.F.R. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1; *Burnett*, 220 F.3d 112,

119.  In making this determination, the ALJ is guided by several basic principles set forth by the

social security regulations, and case law.  First, if a Plaintiff's impairment meets or equals one

of the listed impairments, the Plaintiff is considered disabled *per se*, and is awarded benefits.

20 C.F.R. §§ 404.1520(d), 416.920(d); *Burnett*, 220 F.3d at 119.   However, to qualify for

benefits by showing that an impairment, or combination of impairments, is equivalent to a listed

impairment, Plaintiff bears the burden of presenting "medical findings equivalent in severity to

*all* the criteria for the one most similar impairment."  *Sullivan v. Zebley*, 493 U.S. 521, 531

(1990); 20 C.F.R. §§ 404.1520(d), 416.920(d).  An impairment, no matter how severe, that

meets or equals only some of the criteria for a listed impairment is not sufficient.  *Id.*

Listing 12.05 contains two parts: an introductory paragraph, and a set of four criteria for

determining whether the required level of severity for the disorder has been established.  20

C.F.R., Pt. 404, Subpt. P, Appx. 1 § 12.05.  The introductory paragraph contains a capsule

"diagnostic definition" of the disorder:

> intellectual disability refers to significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially manifested during the
> developmental period; i.e., the evidence demonstrates or supports onset of the

impairment before age 22.

*Id*.  As is relevant to Plaintiff's claim, the severity level of "paragraph C" is satisfied where a Plaintiff's has "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. A Plaintiff has an impairment of listed severity under §12.05 where the alleged impairment "satisfie[s] the diagnostic description in the introductory paragraph [of § 12.05] *and* any one of the four sets of criteria." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

In this case, the ALJ's analysis of Plaintiff's intellectual disability under listing 12.05 is somewhat disjointed, as he addressed it at two different steps in his decision.  At step three, the ALJ found that:

> the "paragraph C" criteria of listing 12.05 are not met because the [Plaintiff] does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  Although there is evidence of a full scale IQ of 65, there is a significant, inexplicable discrepancy with IQ testing from 2003, which yielded a full scale IQ of 79.  Additionally, as discussed above in paragraph 3, and below, the undersigned does not find there to be another impairment imposing an additional and significant work-related limitation of function.

(TR 91).

The ALJ also addressed Plaintiff's IQ scores, and level of "adaptive functioning" in his RFC analysis, where he noted that:

> [t]he intelligence testing, overall, is given limited weight.  There is a significant and unexplained disparity in the [Plaintiff's] IQ scores over time.  There is no evidence that between 2003 and 2010 that there was a significant trauma or other situation that would worsen the [Plaintiff's] condition or further impair his intelligence.  Dr. Timchack's finding of a full scale IQ score of 65 is not consistent with the other evidence of record when considered in its entirety.  The [Plaintiff] was able to communicate during the hearing, he is able to drive, he can play

-14-

video games and use a computer, he can shop in stores, he can watch young children, he is able to make simple meals, and he can perform chores.  This is not consistent with the intellectual deficits indicated by a full scale IQ of 65.

\* \* \*

When viewing the [Plaintiff's] adaptive functioning it appears that he has obtained a drivers license, and thereby passed both the written exam and field test, he engages in child care and parental oversight, helps out with chores around the house, performs his activities of daily living and [is] independent regarding self-care, personal hygiene and daily routines.  He is also apparently able to do some simple meal preparation.  The [Plaintiff's] wife works, and thus the [Plaintiff] does have time home by himself, and also with the kids for intervals of time.  There also appear to be intervals of work efforts including sales associate at a retail store.

(TR 94-95).

### 1.    The ALJ's finding that Plaintiff's 2010 Full Scale IQ Score of 65 was Invalid is Unsupported by Substantial Evidence

Plaintiff's primary contention is that the ALJ erroneously invalidated Plaintiff's 2010 IQ score of 65.  (Doc. 9 p. 14).  The Commissioner responds that the ALJ properly found Plaintiff's 2010 full scale IQ score of 65 to be invalid because it was inconsistent with Plaintiff's activities of daily living, and due to the unexplained discrepancy between Plaintiff's 2010 and 2003 full scale IQ scores.  (Doc. 12 p. 18).

With respect to the first criterion of listing 12.05C, where a single, valid IQ test yields multiple IQ scores, the SSA will use the lowest single score in conjunction with listing 12.05. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 12.00D.6.c.  The Third Circuit has not addressed the issue of how to weigh multiple sets of valid IQ tests, where only one test yields a score which would qualify the Plaintiff for benefits under a listing. Several other courts, however, have held that where there are multiple valid IQ tests the regulations require only one valid IQ score within the prescribed range. *See e.g. Coogan v. Astrue*, No. 08-CV-1387, 2009 WL 512442 *5

n.1, *6 n. 2(D.N.J. Feb 27, 2009); *Ray v. Chater*, 934 F.Supp. 347, 348 (N.D.Cal. 1996).

"[T]he [ALJ] is not required to accept a [Plaintiff's] IQ scores and may reject scores that are inconsistent with the record." *Markle*, 324 F.3d at 186.  Though, "[a]n ALJ cannot reject IQ scores based on personal observations of the [Plaintiff] and speculative inferences from the record."  *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000).

> Test results may be considered invalid where there is evidence that the [Plaintiff] was malingering or deliberately attempting to distort the results during the test administration or when the conditions under which the test was given could have negatively affected the scores. See, e.g., *Clay v. Barnhart*, 417 F.3d 922, 930 (8th Cir.2005) (psychologist rejected the results of the IQ test he had administered due to his conviction that the [Plaintiff] was malingering); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir.1989) (failure to eat for two days and drinking extensively before the IQ test may have contributed to low scores inconsistent with [Plaintiff's] ability to perform his work assignments, understand and follow directions, relate to coworkers, and withstand the stress of daily work); and *Lax* [v. Astrue], 489 F.3d [1080, 1087 (10th Cir. 2007)]([Plaintiff's] inadequate" effort and inconsistent performance on IQ test resulted in scores which appeared to be an "under estimation of his cognitive abilities.") Similarly, test results may be deemed invalid where the IQ scores are inconsistent with the claimant's prior educational or work history, daily activities, behavior, or other aspects of his life. See, e.g., *Brooks v. Barnhart*,[167 Fed. Appx. 598, 599] (9th Cir. Feb. 16, 2006) ([Plaintiff] who graduated from technical school with a B average, worked for 17 years as a psychiatric technician, and was attending medical technician's school with an A average at the time of her IQ test functioned at educational and occupational levels inconsistent with her verbal IQ of 59 and fullscale IQ of 65); *Clark v. Apfel*, 141 F.3d 1253, 1256 (8th Cir.1998) (ALJ did not err by rejecting IQ scores of [Plaintiff] who was literate, had completed ninth grade without special education classes, worked in the private sector, had a driver's license, and was the primary caretaker of her child); and *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir.1986) (ALJ could reject otherwise qualifying IQ scores based on evidence showing [Plaintiff] had an associate's degree, was currently enrolled in college, and had worked at several skilled jobs, e.g., teaching algebra at a private school).

*Velardo v. Astrue*, No. 04-CV-1604, 2009 WL 229777 *8 (W.D.Pa. Jan. 29, 2009).

In this case, the evidentiary record contains scores from two IQ tests, and references the result of a third.  Of the two tests included in the record, only the 2010 test yielded a qualifying

score under listing 12.05C.  At step three of his analysis, the ALJ recognized that, while Plaintiff's 2010 IQ test yielded qualifying score, it was not valid.   Thus, we are called upon to decide whether the ALJ's decision to invalidate Plaintiff's 2010 IQ score is supported by substantial evidence.  In his decision, the ALJ offered two reasons for his invalidation of Plaintiff's 2010 IQ score.   First, the ALJ concluded that Plaintiff's IQ score of 65 was invalid due to the inexplicable difference between the two scores from 2003 and 2010.  Second, the ALJ noted that Plaintiff's activities of daily living were inconsistent with the finding that Plaintiff had a mild intellectual disability.  We find that the ALJ's decision to discount Plaintiff's 2010 IQ score is unsupported by substantial evidence.

At the outset, we note that the ALJ's treatment of Plaintiff's 2003 IQ scores is marked by internal inconsistency.  At step three, the ALJ cited to Plaintiff's 2003 full scale IQ score of 79 as a basis to discount Plaintiff's 2010 IQ score, then later discounted the 2003 test because it predated Plaintiff's alleged onset date by more than four years.[7]   In addition, the test administrator from Plaintiff's 2003 IQ test remarked that Plaintiff's full scale IQ score of 79 was

---

[7]Neither party has addressed the issue of whether the ALJ properly discounted Plaintiff's 2003 IQ test, and it is not material to the issue of whether substantial evidence supports the ALJ's decision to discount Plaintiff's 2010 IQ score.  However, because we are remanding this case for further consideration of whether Plaintiff meets listing 12.05C we feel compelled to note that Listing 12.05 contains no temporal limit on the validity of IQ tests.  However, listing 112.00D.10., the mental disorder listing for individuals under age 18, recognizes that:

> [g]enerally, the results of IQ tests tend to stabilize by the age of 16.  Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.  IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the IQ is less than 40, and for 2 years when the IQ is 40 or above.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 112.00D.10.

not an effective single index of Plaintiff's general intelligence. In essence, the ALJ invalidated Plaintiff's 2010 IQ score because it was *inconsistent* with an *inaccurate* IQ score from 2003. Thus, we find that the ALJ's invalidation of Plaintiff's 2010 IQ score based on a comparison to a prior, inaccurate, IQ score is unsupported by substantial evidence. Our analysis, however, cannot end here, as the ALJ articulated a second basis for his invalidation of Plaintiff's 2010 IQ score. Namely, that Plaintiff's IQ score of 65 was inconsistent with his activities of daily living.

As discussed above, the law is clear that the Commissioner may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting medical opinions or other record evidence that a Plaintiff had more advanced functional capabilities than would be expected from an individual with a below-average IQ. *Markle*, 324 F.3d at 186. But the ALJ's personal observations or speculative inferences do not constitute substantial evidence to support the rejection of Plaintiff's 2010 IQ scores. *Morales*, 225 F.3d at 318 (finding that an ALJ incorrectly rejected a Plaintiff's IQ score based on his own observation of Plaintiff's demeanor, and the inference that an individual with an IQ in the 50's could not function in a normal work environment or follow the plot of daytime television shows). In addition, multiple courts have held that a Plaintiff's ability to engage in simple daily activities, like those identified here,[8] is not enough to invalidate otherwise valid IQ scores within the range prescribed by 12.05C. *See Markle v. Barnhart*, 324 F.3d at 186 (finding that a Plaintiff's ability to pay his own bills, add and subtract, use an ATM, take care of his personal needs, identify and administer his

---

[8]Specifically, the ALJ found that Plaintiff's abilities to drive (with adult assistance), play video games, use a computer, shop in stores (with adult assistance), watch young children (for two hours or less), prepare simple meals (e.g. grilled cheese or frozen dinners), and perform simple household chores were inconsistent with a full scale IQ of 65. (TR 94).

own medication, and obtain a GED were not inconsistent with a full scale IQ of 70); *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1991)(rejecting the Commissioner's argument that a Plaintiff's full scale IQ of 68 was inconsistent with his ability to make change, do laundry, clean his room, obtain a commercial driver's license, and his past employment as a commercial truck driver); *Black v. Astrue*, 678 F.Supp. 2d 1250, 1261 (N.D.Fl. 2010)(finding that a Plaintiff's abilities to work as a farm laborer, drive short distances, cook, take care of personal needs, and handle cash was offset by her reliance on her family for more complicated activities, such as raising her children, and was not inconsistent with an IQ score between 60 and 70); *compare Brooks v. Barnhart*, 167 Fed. Appx. 598, 599 (9th Cir. 2006)(affirming the ALJ's conclusion that a Plaintiff who graduated from technical school with a B average, worked for 17 years as a psychiatric technician, and was attending medical technician school with an A average functioned at educational and occupational levels that were inconsistent with a verbal IQ of 59); *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986)(affirming the ALJ's conclusion that a Plaintiff who had an associate's degree, was enrolled in college, and had worked as a high school algebra teacher functioned at a level inconsistent with an IQ of 69). Here, the activities identified by the ALJ are consistent with the activities discussed in *Markle*, *Brown*, and *Black* and therefore are not inconsistent with an IQ within the range prescribed by listing 12.05C; thus, we conclude that the ALJ's invalidation of Plaintiff's 2010 IQ score is unsupported by substantial evidence. Accordingly, we recommend that on remand the ALJ re-assess the validity of Plaintiff's 2010 IQ score.

**2.     The ALJ's finding that Plaintiff did not have another impairment imposing an additional and significant work-related limitation of function is inconsistent with his findings at Step Two of the Sequential Evaluation Process**

Plaintiff argues that his alleged impairments of back pain, depression, and anxiety, were "additional and significant work-related impairments" which satisfied the second criterion of listing 12.05C. (Doc. 9 p. 13). The Commissioner asserts that the record evidence supports the ALJ's finding that Plaintiff did not have a physical or other mental impairment imposing an additional and significant work-related limitation of function (Doc. 12 p. 19).

With respect to the second criterion, the issue of whether a Plaintiff has another impairment which imposes an additional and significant work-related limitation of functioning is evaluated under the same standard applied in step two of the sequential evaluation process. *See Markle*, 324 F.3d at 188 (*quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed.Reg 50746, 50772 (Aug. 21, 2000)("the Commissioner.....addressed the second prong of § 12.05C, stating that '[w]e always have intended the phrase to mean that the other impairment is a 'severe' impairment as defined in [20 C.F.R.] §§ 404.1520(c) and 416.920(c).'"); *see also* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 12.00A ¶4.

Here, at step two of the sequential evaluation process, the ALJ concluded that Plaintiff suffered from the severe impairments of depression and anxiety. (TR 87). Furthermore, the ALJ concluded that Plaintiff be restricted to the performance of a range of light work eroded by several additional postural and non-exertional limitations based on the combination of his severe and non-severe impairments. (TR 91-95). In sharp contrast, at step three the ALJ found that Plaintiff had no other impairment imposing an additional and significant work-related

limitation of function.  The ALJ failed to provide any explanation reconciling these inconsistent conclusions.  Based on the standard set by the SSA, we conclude that the ALJ erred as a matter of law at step three by rejecting as impairments which impose additional and significant work-related limitations of function the same impairments he found to be severe at step two.

Accordingly, we recommend that the ALJ re-evaluate the issue of whether Plaintiff has another severe impairment imposing an additional and significant work-related impairment in satisfaction of the second criterion of listing 12.05C.

3.     **The ALJ did not adequately address whether Plaintiff met the capsule "diagnostic definition" articulated in the introductory paragraph of Listing 12.05.**

In her brief, the Commissioner asserts that the ALJ reviewed the evidence before him, and appropriately found that Plaintiff did not have the requisite deficits in adaptive functioning prior to age 22.  (Doc. 12 p. 15).  Our review of the ALJ's decision, however, reveals that, the ALJ did not address this issue whether Plaintiff experienced any deficit of adaptive functioning *prior to age 22*.

It is clear that, in order to meet the criteria of listing 12.05, the record should contain some evidence that supports the finding that the onset of a Plaintiff's intellectual disability preceded age 22. *Markle*, 324 F.3d 182, 189.  Here, there is at least some evidence that is consistent with, and *could* be said to support, onset prior to age 22.  Plaintiff testified that, in school he took special education classes through eleventh grade, when he dropped out.  Dr. Taren's medical report noted that Plaintiff attended special education classes beginning in second grade, and was diagnosed with mild mental retardation based on low IQ scores from a test administered in 1998.  Plaintiff unsuccessfully attempted to obtain a GED.  He has never

held a job for more than a few months.  In contrast, at age 18 Plaintiff was administered an IQ test, which yielded a verbal IQ score one point above the range prescribed by 12.05C.

However, the ALJ did not adequately address this issue as his inquiry concluded with a denial of benefits based on the "paragraph C" severity criteria of listing 12.05.  While the ALJ did address Plaintiff's "adaptive functioning" briefly in his RFC assessment, he simply identified activities of daily living that Plaintiff could perform rather an addressing whether any deficit existed; he did not discuss whether any such deficit existed prior to age 22.  When faced with a similar situation, the Third Circuit noted that it was incumbent upon the Court to remand to the agency to address such an issue in the first instance.  *Markle*, 324 F.3d 182, 189 (*citing INS v. Ventura*, 537 U.S. 12 (2002)).  Therefore, we will remand this matter to the Agency to provide its interpretation of the record on this issue and allow it to develop the record further, if necessary, to make a finding of whether Plaintiff's intellectual disability commenced before age 22.

Accordingly, we recommend that this case be remanded for re-evaluation of the validity of Plaintiff's 2010 IQ test, resolve the issue of whether Plaintiff has any additional and significant work-related limitation of function, and make a finding as to whether Plaintiff meets the diagnostic definition of listing 12.05C.

Because we recommend that this case be remanded for further proceedings, we find that it is unnecessary to address Plaintiff's contentions that the ALJ improperly found his back impairment to be non-severe, and that the ALJ improperly discounted Dr. Timchack's medical report in formulating his RFC analysis.  Such deficiencies, if they exist, can be remedied in a future decision.

**VI.     RECOMMENDATION.**

Based upon the foregoing, it is respectfully recommended that the final decision of the

Commissioner of Social Security denying Plaintiff's claims for DIB and SSI be **REMANDED** to

the Commissioner for further proceedings consistent with this Report.


_____

                                        s/ Thomas M. Blewitt
_____     **THOMAS M. BLEWITT**
                                        **United States Magistrate Judge**

_____


**Dated:   May 7, 2014**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JUSTIN OGIN, | : | CIVIL NO: **3:CV-13-01365** |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Kosik) |
| v. | : | |
| | : | (Magistrate Judge Blewitt) |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| | : | |
| Defendant. | : | |

**NOTICE**

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **May 7, 2014.**

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where  required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely Objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.


<u>**s/ Thomas M. Blewitt**</u>
**THOMAS M. BLEWITT**
**United States Magistrate Judge**


**Dated:** May 7, 2014